IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SCOTT A MCPARTLAND,** | : Civil No. 1:22-CV-00284 |
| Plaintiff, | : |
| v. | : |
| **CHASE MANHATTAN BANK USA, NA. t/d/b/a CHASE BANK CARD SERVICES, INC.,** | : |
| Defendant. | : **Judge Sylvia H. Rambo** |

## M E M O R A N D U M

Between December 2020 and February 2021, more than 175 allegedly fraudulent charges were made to gambling and gift card websites on two J.P. Morgan Chase (Defendant, "Chase")[1] accounts belonging to Scott McPartland (Plaintiff, "McPartland"). McPartland admits that the first charge made to a gambling website was made by his then partner (now wife), Tiffany, and was legitimate, but otherwise disputes the remaining charges. Chase asserts that, in consultation with the merchants to whom the charges were made, it investigated and determined the charges were legitimate and refused to remove them from McPartland's accounts. McPartland alleges that in doing so, Chase violated the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and breached its card member agreements with him.

---

[1] Chase points out in its brief that the caption improperly identifies its corporate name, which is J.P. Morgan Chase Bank, N.A. (Doc. 33.)

Before the court is Chase's motion for summary judgment. (Doc. 31.) Because McPartland has not raised a genuine dispute of material fact with respect to the unauthorized use of the credit cards and has not established that he suffered actual damages, Chase's motion will be granted.

I.   **Factual Background and Procedural History**[2]

McPartland and Tiffany reside at 513 Sandpiper Lane in New Cumberland, Pennsylvania. The couple began dating in summer 2016, became engaged in November 2020, married in June 2022, and have resided together at the home for about six years with McPartland's three children and Tiffany's three children.

McPartland and Tiffany share a family cell phone plan through AT&T and Xfinity internet for the home. Both McPartland and Tiffany access the internet through their phones, and Tiffany, who works from home, uses the Xfinity internet

---

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial. *See id.*

McPartland not only failed to file a separate statement, instead appending it to his memorandum in opposition, he did not substantively respond to Chase's statement of undisputed facts, instead improperly providing his own statement despite being the non-moving party. (*See* Doc. 42.) However, because the court prefers to resolve disputes on the merits rather than on procedural deficiencies, it has considered and scrutinized this supplemental information as well as the entire record to determine the uncontroverted facts in this matter.

Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts and the exhibits of record.

to access her work computer for both work and personal reasons. Tiffany uses two email addresses, one which she checks daily: jac022320@yahoo.com, and one she does not: tiffany.flynn627@outlook.com. McPartland's email address is scott20474@aol.com. McPartland does not know the IP address for either his phone through AT&T or for the home through Xfinity and has never attempted to obtain either IP address.

On May 31, 2017, McPartland opened a Disney-branded credit card account with Chase that had an account number ending in 7645 (the "Disney Account"). On December 18, 2018, McPartland opened a Marriott Bonvoy-branded credit with Chase that had an account number ending in 9733 (the "Bonvoy Account"). Both accounts are governed by cardmember agreements stating that the card holder is responsible for any use by an authorized user or anyone else the card holder permits to use the account. The agreements "do not state that a cardmember will not be responsible or liable for fraudulent or unauthorized transactions." (Doc. 32 ¶ 27; Ex. 5; Ex. 6.)

McPartland kept the physical cards connected to the Bonvoy Account and the Disney Account in a mug on the dresser of his bedroom. Tiffany had access to both the Bonvoy Account and the Disney Account and stored the account information on her phone.

Between December 22, 2020, and February 3, 2021, more than fifty charges to "LuckyLand" and "Chumba Gold Coins" ("Chumba") gambling websites, were made using the Bonvoy Account. (Doc. 32 ¶ 36; Ex. 7.) Between January 15, 2021, and January 23, 2021, three charges to BHN*Giftcards, a gift card website, were made using the Bonvoy Account. (Doc. 32 ¶ 37.) McPartland admitted, however, that the first such charge to the Bonvoy Account on December 22, 2020, to LuckyLand for $49.99 was a legitimate charge. He further admitted that Tiffany made the legitimate charge and must have had an account with LuckyLand. McPartland contests the remaining charges. Between December 26, 2020, and January 11, 2021, more than 100 charges to LuckyLand and Chumba Gold Coins were made using the Disney Account. (Doc. 32 ¶ 42; Ex. 9.) McPartland denied authorizing any of these charges, many of which were for $99.99 or $100.00 for each charge. (Ex. 9.)

By letter dated February 3, 2021, Chase notified McPartland that it closed the Bonvoy and Disney Accounts based on the rapid increase in revolving balances and balances which were too high for the account limits. (Doc. 32 ¶ 43.) On March 3, 2021, McPartland called Chase twice to report fraudulent activity on the accounts. He reported that all the charges on the Disney Account were unauthorized or fraudulent and that all but the December 22, 2020, charge to LuckyLand on the Bonvoy Account were unauthorized or fraudulent. Chase acknowledged receipt of

4

McPartland's dispute of these charges on March 9, 2021. Chase submitted the disputed charges to the merchants and directed them to review McPartland's claim that he did not authorize most of the charges.

LuckyLand and Chumba responded to Chase's inquiry, providing documentation the merchants used to validate the charges. Using the documentation, Chase confirmed that the billing address matched McPartland's address, that the email address connected to the account that made the purchases (jac022329@yahoo.com) belonged to Tiffany, and that the IP address for the legitimate charge matched that of many of the disputed charges. The same IP address (107.77.203.126) was used to access McPartland's Chase account during the relevant period. Other charges to LuckyLand and Chumba were made using a device with a different IP address (71.207.51.142), an address that was also used to access McPartland's Chase account during the relevant period. LuckyLand and Chumba informed Chase that based on this information, it concluded that the cardholder authorized the purchases.

Chase similarly inquired with BHN*Giftcards regarding the disputed purchases, and BHN*Giftcards supplied Chase with documentation related to the charges. The customer profile for the purchases matched McPartland's name, address, phone number, and Tiffany's email address (jac022320@yahoo.com), and the gift cards were emailed to Tiffany's second email address

(tiffany.flynn627@outlook.com). The gift cards were then redeemed for online gambling purchases with LuckyLand and the Pennsylvania lottery. Based on this information, BHN*Giftcards concluded that compelling evidence showed the cardholder was in possession of the merchandise.

By letters dated March 16, 2021, and March 17, 2021, Chase informed McPartland that, after a review of the documentation regarding the disputed charges, it had determined that he was responsible for all of the charges because he received the benefit from those charges. McPartland objected to its findings, and Chase again reviewed the disputed charges, and on April 19, 2021, informed McPartland that it concluded the charges were valid. On April 20, 2021, it sent McPartland all of the documents received from LuckyLand and BHN*Giftcards that the merchants relied on in rejecting his claim of fraud. Chase reviewed the charges again on May 28, 2021, and on June 1, 2021, and again informed McPartland that the charges were valid.

By letter dated November 6, 2021, Chase informed McPartland that the Bonvoy Account had an unpaid balance of $20,819.25, and the Disney Account had an unpaid balance of $16,557.01. To date, McPartland has not informed Chase as to the nature of the actual damages in this case.[3] However, McPartland and Tiffany

---

[3] When asked to identify each item of damages he claims in this action in Chase's interrogatories, McPartland's response was that he "continues to assess his damages in this action and will substitute a response at a later date." (Doc. 32 ¶ 86.) When asked at his deposition if "[s]itting here

6

both deny that the disputed charges were made by them and further allege that they were the victims of identity theft. McPartland, however, admitted that both he and Tiffany dabbled in gambling, and that he both knew her to play the Pennsylvania lottery and saw her gambling on her phone while in their bed.

McPartland filed this action in the Court of Common Pleas of Dauphin County before Chase removed the action to this court on February 24, 2022. (Doc. 1.) After motion practice, McPartland filed an Amended Complaint on July 5, 2022. (Doc. 19.) Before the court is Chase's motion for summary judgment. (Doc. 31.)

The motion has been fully briefed and is ripe for disposition.

## II. **Legal Standard**

Federal Rule of Civil Procedure 56(a) provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law and is "genuine" only if there is a sufficient evidentiary basis for a reasonable factfinder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, a

---

today," he knew his actual damages, McPartland responded, "I do not." (Doc. 32 ¶ 87.) McPartland has not supplemented his response to date.

court "must view the facts in the light most favorable to the non-moving party" and draw all reasonable inferences in their favor. *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23. "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the

court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

### III.   Discussion

The express purpose of TILA is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). In essence, "Congress enacted TILA to guard against the danger of unscrupulous lenders taking advantage of consumers through fraudulent or otherwise confusing practices." *Cappuccio v. Prime Cap. Funding LLC*, 649 F.3d 180, 188 (3d Cir. 2011), *as amended* (Sept. 29, 2011) (internal quotation omitted). As a remedial statute, TILA "should be construed liberally in favor of the consumer." *Id.* (internal quotation omitted). TILA's private right of action provides that "any creditor who fails to comply with any requirement imposed under [15 U.S.C. §§ 1631-1651] . . . with respect to any person is liable to such person" for relief that includes "any actual damage sustained by such person as a result of the failure." 15 U.S.C. § 1640(a). It does not, however, allow a cardholder to seek reimbursement for monies already paid to a creditor. *Azur v. Chase Bank, USA*, F.3d 212, 217 (3d Cir. 2010).

As relevant here, Section 1643 of TILA addresses the unauthorized use of a credit card and allows a credit card issuer to hold a cardholder liable for an unauthorized charge:

> only if—
> (A) the card is an accepted credit card;
> (B) the liability is not in excess of $50;
> (C) the card issuer gives adequate notice to the cardholder of the potential liability;
> (D) the card issuer has provided the cardholder with a description of a means by which the card issuer may be notified of loss or theft of the card, which description may be provided on the face or reverse side of the statement required by section 127(b) [15 USCS § 1637(b)] or on a separate notice accompanying such statement;
> (E) the unauthorized use occurs before the card issuer has been notified that an unauthorized use of the credit card has occurred or may occur as the result of loss, theft, or otherwise; and
> (F) the card issuer has provided a method whereby the user of such card can be identified as the person authorized to use it.

15 U.S.C. § 1643(a)(1)(A)-(F).

"Unauthorized use" is defined in the statute as "the use of a credit card by a person other than the cardholder who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit." 15 U.S.C. § 1602(p); *DBI Architects, PC v. Am. Express Travel Related Servs. Co.*, 388 F.3d 886, 894 (D.C. Cir. 2004) ("use of a card is 'unauthorized' only if the cardholder derives no benefit from it and it lacks actual, implied, or apparent authority"). By including actual, implied, and apparent authority in its definition of unauthorized use, "Congress apparently contemplated primary reliance on background principles of agency law in determining the liability of cardholders for charges incurred by third-party card bearers." *Towers World Airways, Inc. v. PHH Aviation Systems, Inc.*,

933 F.2d 174, 176 (2d Cir. 1991) (alterations omitted). Here, pursuant to Chase's cardholder agreements, Delaware agency law applies.

Chase argues that the disputed charges were made by someone with actual authority to use the Chase accounts, and at a minimum, the purchases were made by someone with apparent authority to do so. (Doc 33 at pp. 7, 10.) Chase further argues that McPartland has not established actual damages as required by TILA. In response, McPartland repeats that he and Tiffany were the victims of identity theft.

There are two main forms of authority under Delaware agency law: actual and apparent authority. *Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 712 (Del. 2019). An agent acts with actual authority "when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Id.* (quoting *Harmon v. State, Del. Harness Racing Comm'n*, 62 A.3d 1198, 1201 (Del. 2013)). In contrast, apparent authority "is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has the authority to act on behalf of the principal and that belief is traceable to the principal's manifestations. *Id.* (quoting *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725 799 (Del. Ch. 2014)).

Here, McPartland vehemently denies that either he or Tiffany made the purchases, and thus argues that no one with actual authority made the purchases.

11

Drawing all inferences in favor of the non-moving party, the court agrees that Chase cannot, at least at this juncture, prevail on the theory that the charges were made by someone with actual authority given that McPartland and Tiffany both denied making these charges in their deposition testimony and in their written filings to the court. McPartland further argues that he "did not grant any individual apparent authority to make the charges." (Doc. 42.) This is a misunderstanding of apparent authority, as apparent authority relies not on an express grant of authority, but on a third party's reasonable belief that they have the authority to act and that belief being traceable to the manifestations of the principal.

Here, notwithstanding McPartland's uncorroborated allegations of identity theft, the court agrees with Chase that the purchases were made with someone who had apparent authority. While there is a dearth of case law in this Circuit, and indeed across all circuits, regarding TILA, Chase cites to a case that this court finds both highly persuasive and dispositive on this issue. In *Grube v. Amazon.com, Inc.*, 2017 U.S. Dist. LEXIS 143914 (D. N.H. Sept. 6, 2017) the plaintiff purchased two Amazon Kindle tablets, which she linked with her Amazon-branded credit card and set up passwords required to make purchases, giving one tablet each to her two young children. *Id.* at *3-4. She did not share the passwords with her children. *Id.* at *4. Soon after, the plaintiff discovered that more than 72 "in-app purchases," the majority of which were made to "MyNBA2K15" and "WWE SuperCard," totaling

more than $2,500, were made using the kindle devices. *Id.* at *6. The plaintiff admitted that her son was interested in wrestling, that he could have made the purchases, and that she could not think of anyone other than her son who could have made the purchases. *Id.*

She then sued the credit issuer, arguing that she did not authorize the purchases. *Id.* at *15. In finding that her son had apparent authority,[4] the court reasoned that a principal's manifestations of apparent authority "need not be communicated directly to the third-party." *Id.* at *17 (citing Restatement (Third) of Agency § 3.03, cmt. b. (2006) ("A principal may make manifestations regarding an agent's authority in many ways . . . . [A]n indirect route of communication between a principal and a third party may suffice, especially when it is consistent with practice in the relevant industry."). The court explained that the actions of the principal, *i.e.*, the plaintiff, "demonstrated that the agent (the person who made the in-app purchases on the Kindle devices) had the authority to act on behalf of the principal . . . ." *Id.* at *17-18.

The same is true here. Chase and the merchants to whom the purchases were made verified that the account information matched that of Tiffany, a person who had actual authority to make the purchases, even if Tiffany did not make them

---

[4] The court notes that in *Grube*, the governing law was either New Hampshire or Utah agency law, not Delaware law as in the instant case. *Grube*, 2017 U.S. Dist. LEXIS at *17.

herself. The purchases were sent to an account linked to Tiffany's email address, and it is unclear that anyone else would have received the benefit of the purchases other than Tiffany. Further, the IP addresses of the devices used to make the purchases matched the IP addresses that were used to access McPartland's Chase accounts during the relevant time period. Moreover, regarding the purchases to BHN*giftcards, the giftcards were delivered to an email account belonging to Tiffany. Given these facts, Chase and the Merchants were justified in concluding that the purchases were legitimate, and no reasonable jury could find that the purchases were not made by someone who had at least apparent authority to do so. Because the court concludes that the charges were not unauthorized as defined by TILA, McPartland's claim to limit his liability fails.

McPartland brings a second claim for breach of contract, alleging that by holding him liable for the charges, Chase has violated the terms of its cardholder agreements. This too is resolved with reference to Delaware law. Under Delaware law, three elements are required to establish breach of contract: (1) the existence of a contract; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach. *Geico Gen. Ins. Co. v. Green*, 308 A.3d 132, 140 (Del. 2022). Although he fails to point to the specific provision which Chase purportedly breached, McPartland suggests that Chase breached the agreement by holding him responsible for unauthorized charges. However, the agreements do not state that a

cardholder will not be responsible for purportedly unauthorized charges. Further, even if such language could be construed from the agreements, the court has already found that the purchases were authorized, at least within the meaning of TILA.

Further, McPartland's TILA and breach of contract claims also fail because McPartland has not produced any evidence supporting actual damages. Under TILA, a plaintiff may recover actual damages suffered as a result of a creditor's failure to abide by TILA's terms. 15 U.S.C. § 1640(a). Similarly, as stated previously, a plaintiff in a Delaware breach of contract action must show that damages resulted from the defendant's breach of the contract. Yet Plaintiff has produced nothing regarding his damages, other than vague references to harms that he continues to suffer by being held liable for the charges. This is not enough to maintain either a TILA claim or a breach of contract claim at summary judgment. If this case were to proceed to trial, Chase would be unduly prejudiced if unaware of the amount and nature of McPartland's damages because of his failure to produce any evidence during discovery. While this court noted in its memorandum opinion denying Chase's motion to dismiss that TILA entitles a plaintiff to statutory damages calculated at "twice the amount of any finance charge in connection with the transaction, with a minimum of $500 and a maximum of $5,000," McPartland has not provided the court with the amount of any finance charges that it could use to calculate these statutory damages. *See McPartland v. Chase Manhattan Bank USA,*

*N.A.*, 2022 U.S. Dist. LEXIS 990023 *11 (Pa. M.D. June 2, 2022) (citing 15 U.S.C. § 1640(a)(2)(A)(iii); § 1602(j)). Thus, even if McPartland had established a genuine dispute of material fact with respect to the unauthorized use of his credit card, each claim would independently fail for his failure to provide a genuine dispute of material fact with respect to damages.

### IV.    Conclusion

For the reasons set forth above, Chase's motion for summary judgment will be granted. An appropriate order shall follow.

/s/ Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: August 22, 2024